**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

LORRAINE COLISTRA,

                                          Plaintiff,                        6:16-cv-01053 (BKS/TWD)

v.

THE CAIRO-DURHAM CENTRAL SCHOOL DISTRICT
and the CAIRO-DURHAM CENTRAL SCHOOL
DISTRICT BOARD OF EDUCATION,

                                         Defendants.

**Appearances:**

Phillip G. Steck
Cooper Erving & Savage LLP
39 North Pearl Street
Albany, NY 12207
*For Plaintiff*

Andrea P. Demers
Maynard, O'Connor, Smith & Catalinotto, LLP
6 Tower Place
Albany, NY 12203
*For Defendants*

**Hon. Brenda K. Sannes, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiff Lorraine Colistra brings this action against her former employer, Defendants

Cairo-Durham Central School District (the "District") and the District's Board of Education (the

"Board"). (Dkt. No. 1). Plaintiff, a female who was 58 years old at the time the District

terminated her employment, alleges gender discrimination and retaliation in violation of Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"),

and age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634. (Dkt. No. 1). Defendants move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 23). For the following reasons the motion for summary judgment is denied.

## II.     FACTS[1]

In May 2013, District Superintendent Mary Fassett hired Plaintiff as Director of Pupil Personnel Services. (Dkt. No. 23-4, at 10). In June 2013, Plaintiff's title was amended to Director of Pupil Personnel Services, Curriculum and Instruction. (*Id.* at 12). As a three-year probationary appointment, Plaintiff's "tenure would be evaluated at the end of the third year." (Dkt. No. 24, ¶ 8; Dkt. No. 23-4, at 10). The "Curriculum and Instruction" aspect of Plaintiff's position required her to oversee the development of a "District Comprehensive Improvement Plan" ("DCIP"), "which was a requirement pursuant to the State's Focus designation." (Dkt. No. 24, ¶ 9).[2] Plaintiff was also responsible for "coordinating the submission of the consolidated grant application among the several responsible administrators" and overseeing the District's special education department and ensuring special education students received the equipment and services prescribed in" their individual education plans ("IEPs") and Section 504[3] plans. (Dkt. No. 24, ¶ 8; Dkt. No. 31, ¶ 8; Dkt. No. 33, ¶ 8). In addition, Plaintiff was the liaison for homeless students and the Title IX compliance officer. (Dkt. No. 24, ¶ 10).

---

[1] Where possible, the facts have been drawn from Defendants' statement of material facts (Dkt. No. 31), Plaintiff's response thereto (Dkt. No. 33), and the attached exhibits, depositions, and affidavits.

[2] Sometime before 2012, the New York Department of Education designated the Cairo-Durham Central School District as a "Focus District," meaning it was "among the 15% lowest performing school districts in the State." (Dkt. No. 24, ¶ 7). A Focus District is required to propose improvement plans for state approval and can apply for grant funds the state makes available to assist schools in the improvement process. (*Id.*). The District's two elementary schools and middle school were part of the Focus designation, while its high school was not.

[3] Section 504 of the Rehabilitation Act of 1983, 29 U.S.C. § 794.

### A.    2013–2014 School Year

#### 1.    School Improvement Plans

During the 2013–2014 school year Plaintiff, along with Nicole Eschler, an educational consultant who specialized in assisting underperforming schools, worked to develop school improvement plans for the District and for each of the four school buildings.[4] (Dkt. No. 24-6, at 9–10, 25–26). Because there was a "lack of organization in the district," Plaintiff and Eschler put together a governance model at the district level and then worked with the building principals "on how to put together their building level teams" to implement the improvement work. (*Id.* at 25–26). Plaintiff and Eschler made training available to the building principals to help them "put together their building level teams" and to inform them about "what was expected of the various buildings by the State." (Dkt. No. 23-12, at 26; Dkt. No. 24-6, at 24).

The "principals' attendance at the training was sporadic." (Dkt. No. 24, ¶ 11; *see* Dkt. No. 24-6, at 24 (Eschler testifying that the principals were not cooperative in attending the training)). After Plaintiff complained to Superintendent Fassett "that the principals really needed to go to the training," at least two principals attended the trainings. (Dkt. No. 23-12, at 27). Plaintiff testified that when she went to Fassett "to complain of the lack of cooperation," Fassett told her that "Taibi had mentioned that the administrators were feeling that [Plaintiff] was too bossy." (Dkt. No. 23-12, at 95).

#### 2.    Difficulties with Other Administrators

During the 2013–2014 school year, Plaintiff encountered difficulty with Nathan Farrell, the middle school principal, who was "particularly hostile," "consistently harassed" her, and

---

[4] There were four buildings in the District—high school, middle school, Cairo Elementary School, and Durham Elementary School—and each had a principal: Anthony Taibi (High School); Nathan Farrell (Middle School); Scott Richards (Cairo Elementary School); and Tom Baumgartner (Durham Elementary School). (Dkt. No. 23-12, at 20–21).

"used abusive language and bullying tactics in emails and administrative meetings." (Dkt. No. 24, ¶¶ 12, 15). For example, at one point, during a meeting Farrell stated that Plaintiff did not "know anything about special education." (*Id*. ¶ 15). Farrell "would stand up and lean over the table in an intimidating fashion when trying to resist [her] suggestions," (*id*. ¶ 12), "spoke over" Plaintiff, "and disregarded [her] experience and opinions" because, according to Plaintiff, she "was a woman," (*id*. ¶ 15). After Plaintiff spoke to Fassett about Farrell, "his behavior stopped for a time." (*Id*.). Plaintiff avers, however, that other male administrators "frequently talked over [her] at meetings," and "refused to consider [her] suggestions" despite her "significant experience with the issues the district was facing." (*Id*. ¶ 12). Plaintiff states that she, and others,[5] found the District to be a "boys' club," citing, for example: the male administrators' dinners before Board meetings, which Plaintiff was never invited to, even though she was an administrator; and the fact that "[w]hen the administration met, including in . . . 'cabinet meetings' with the superintendent, it was clear that the male members had pre-discussed issues that were to come up at the meetings, issues that [Plaintiff] was being informed of for the first time." (*Id*. ¶ 14).

### 3. Termination of Superintendent Fassett

In July 2014, the Board placed Superintendent Fassett on administrative leave. (Dkt. No. 23-6, at 129; Dkt. No. 24, ¶ 16–17). Prior to terminating Fassett, the Board "called the male members of the administration to speak about Fassett's performance." (Dkt. No. 24, ¶ 14).

---

[5] Durham Elementary School Principal Tom Baumgartner testified that he felt like the Board was a boys' club: "The board . . . they all . . . were friends. There were these guys that were friends and the way they would interact with each other, there was more of like a macho kind of. . . . [I]t was more like a guys type of fraternity." (Dkt. No. 24-7, at 27–28). Baumgartner formed this impression from attending Board meetings and "before board meetings, informal conversations that I would be a part of or not be a part of and would overhear." (*Id*. at 28). Alyssa Doolin, who was the superintendent's secretary and district clerk, attended all Board meetings and was responsible for taking minutes. (Dkt. No. 24-8, at 6). She also attended administrative cabinet meetings while Taibi was superintendent. (*Id*. at 9). Doolin testified that she felt that there was a "boy's club" within the District but that it was not "strictly" related to gender but was more of a "towny kind of group[]." (*Id*. at 13–14).

Plaintiff, who "planned to be away at the time," "was not notified of the meeting or invited to speak." (*Id*.). Fassett's employment with the District ended on August 31, 2014. (Dkt. No. 23-6, at 128). Plaintiff avers that the "five member majority" of the Board was male and "appeared to have a close relationship with [High School Principal] Anthony Taibi and [Middle School Principal] Nathan Farrell and other male members of the district administration." (Dkt. No. 24, ¶ 17). The Board appointed Taibi superintendent "without any listing of the open position or a search." (*Id*.).

### 4.     Submission of School Improvement Plans and Grant Application

The deadline for the District's submission of the 2014–2015 improvement plans and consolidated grant application was August 31, 2014 or September 1, 2014. (*See* Dkt. No. 23-13, at 108–09 (August 31, 2014 deadline); Dkt. No. 32-12, at 28 (September 1, 2014 deadline)). In anticipation of the deadline, Plaintiff and Eschler "had charted out days [Eschler] would come and assist in the planning so that the teams would be prepared for that actual site review" but the "principals asked . . . that the actual site reviews be changed from March to the end of May, beginning of June." (*Id*. at 42–43). Plaintiff states that by postponing the site reviews it became "difficult" for her to complete the improvement plans, which had "to be written in July, submitted at the end of August," in a timely manner. (*Id*. at 43). Although Plaintiff "complained to all of the administrators," there were teams that were not able to meet with Eschler until August. (*Id*.; Dkt. No. 23-12, at 28; Dkt. No. 24, ¶ 38). The rescheduling of the meetings for internal reviews "was the major cause in the delay of the submissions." (*Id*.). Plaintiff states that as the principals were her "administrative equals," she had no authority or control over them. (Dkt. No. 24, ¶ 39). Plaintiff states that she was "sanction[ed]" for "rescheduling meetings," but the principals were not. (*Id*. ¶ 38).

On August 21, 2014, Plaintiff sent an email to Taibi concerning the completion of the improvement plans. (Dkt. No. 23-4, at 96). Plaintiff wrote that she was concerned "that the [improvement plan] is being completed without a team" but stated that she would do her "best to complete this on time"[6] and that she was "feeling a bit stressed and this district level work has no team to develop this important work." (*Id*.). She also noted that she still had to "complete the [c]onsolidated grant" application. (*Id*.). Taibi responded that he had "significant concerns as well," and asked:

> What happened to putting together a shared leadership team consisting of representation of all of the buildings. We needed to have a schedule built to accomplish this work planned out from the time we got last years [improvement plan] back. You said that there was money available for this. Now we are left with a week before it is due and it is no further along than it was in July when Nicole was last here with the team. I will make sure that it is done next week.

(*Id*.). On August 27, 2014, Taibi requested that the state extend the deadline "on the submission" of the District's improvement plan to September 5, 2014. (Dkt. No. 23-4, at 73). The state education department granted the request. (*Id*. at 74).

On August 29, 2014, Taibi emailed Plaintiff to let her know that he had not "received the consolidated [grant] application," which he "was hoping to receive . . . so that we could at least submit this application on-time." (Dkt. No. 23-4, at 71). Taibi also addressed the District's unspent grant money; he wrote that the day had been "extremely frustrating regarding the [2013–2014] grant balances" and that he, and others, had been working

> to try to pull it together to make sure that our grants are closed out appropriately for the 13-14 school year. We are still above our allowable 10% rollover . . . and stand to lose $31.790 [sic]. Grant management has been a mess this entire year and reflects poorly on

---

[6] The state education department had granted an extension on the submission of the District's improvement plan "through August 31, 2014." (Dkt. No. 23-4, at 73).

the district . . . . I am concerned about grants administration for this coming school year and need to consider whether someone else should handle this going forward. I need you to explain how it is going to be different for the 2014-2015 school year.

(*Id*.).

On August 30, 2014, Plaintiff replied that she had "been working very diligently to complete this application" and had "spent many hours working on spending out the grants in areas that were unused." (*Id*.). Plaintiff stated that she "would like to discuss some ongoing concerns" but that email was not "the venue to do so." (*Id*.). Regarding the "management of the grants," Plaintiff wrote that there should be "a scheduled monthly meeting . . . to consistently review and adjust" and that there was "need for monitoring at the building level." (*Id*.). Plaintiff indicated that she had left a message at the "Title I office" that she would be sending the consolidated grant application "without all the required elements through an email by the August 31st due date" and that hard copies would be sent "the first business day next week." (*Id*.).

Plaintiff "submitted the plans by the September 1 date, but they were missing the budget for the school improvement plans."[7] (Dkt. No. 23-12, at 44). When Plaintiff informed the "state ed person" that the budget was missing, she was instructed to send what she had. (*Id*.). The District did not send a hard copy "timely" "because some of the pieces were missing from the lateness of those teams meeting in August." (*Id*.). Plaintiff testified that the budget aspect was sent on September 17 or 18, 2014. (*Id*.).[8]

---

[7] Plaintiff testified that "the budget piece" of the improvement plan was "extremely difficult" because the state had changed the format. (Dkt. No. 23-12, at 44).

[8] Taibi testified that "there was no financial loss by the district due to the late submittal." (Dkt. No. 23-13, at 129).

### B. 2014–2015 School Year

#### 1. "Boys' Club" Comment and Difficulties with Farrell

In September 2014, following an administrators' meeting, Taibi asked Plaintiff to "stay behind to meet with him" and "confronted [her] about a comment he claimed [she] made about the district being a 'boys' club.'" (Dkt. No. 24, ¶ 18). Plaintiff responded that she "had not made such a comment" but "then asked him rhetorically: 'Don't you think it is a boys' club?'" and indicated that she "believed it was." (*Id.*). She gave Taibi "examples such as [her] exclusion from pre-meeting get-togethers, not being informed of meeting topics that others seemed to have already discussed, and the generally disrespectful and dismissive ways the male administrators in the district treated the women they worked with, including" her. (*Id.*). She also told Taibi that it "seemed that men were given preferential treatment compared to women." (*Id.*). Taibi testified that Plaintiff also mentioned, during this discussion, that she was excluded from communications with the Board, that she was not being included in dinners, and that she did not like the way male administrators spoke to her and treated her. (Dkt. No. 23-13, at 70–72).

Plaintiff asserts that after Taibi became superintendent, Farrell resumed his abusive behavior. Plaintiff avers that when she complained to Taibi about Farrell's behavior, Taibi responded, "That's just the way he is sometimes." (Dkt. No. 24, ¶ 15). Plaintiff replied that she "was not comfortable," that she "would not tolerate it," and that, if it continued, she "would file a complaint against Farrell." (*Id.*). "Only then did Taibi agree to speak to him." (*Id.*). After Plaintiff complained to Taibi, Farrell began telling "Taibi that [Plaintiff] was mishandling requests for equipment for special education students" and began sending Plaintiff "vitriolic emails." (*Id.*).

## 2.       First Special Education Issue

In September 2014, an issue arose concerning a tablet or computer for a special education student. (Dkt. No. 23-4, at 52–53). Plaintiff asserts that before her employment, a District employee had recommended that the parent of a special education student purchase a computer to assist with written assignments, that the parent "did so without advice from the technology department," and that the computer was "incompatible with the software requirements of the district." (Dkt. No. 24, ¶ 45). There is an email chain beginning September 17, 2014 between Plaintiff, Taibi, and Farrell concerning the student's "[d]ifficulty with writing assignments" and noting that the "tablet that the parent purchased was an issue." (Dkt. No. 23-4, at 52–53). Plaintiff indicated that she was "looking at the use of a chrome book" for the student. (*Id*. at 53). On October 2, 2014, Farrell emailed Plaintiff and Taibi indicating that he had spoken with the student's parent, who was "frustrated that the Chrome book wasn't deployed." (*Id*. at 54). Farrell wrote that he could not "blame" the parent as he had also believed the chrome book would have been deployed by then. (*Id*.). Plaintiff responded that the student received the computer the day before (October 1, 2014). (*Id*.). Plaintiff asserts that any delay "was caused by actions taken that were not under my control." (Dkt. No. 24, ¶ 45).

## 3.       Denial of Tenure and First Counseling Memorandum

In October 2014, Taibi met with Plaintiff and told her that the Board "would never give" her tenure.[9] (Dkt. No. 24, ¶ 19). When Plaintiff asked "for the reasons," Taibi "said he did not know" but suggested that she "search for a position in another district" and told her that there was a superintendent position open in a nearby district and that he would "assist" Plaintiff in

---

[9] Board member Elizabeth Daly testified that "there were some concerns" about Plaintiff during the July 2014 to October 2014 time period but that she did not recall "anyone from the board suggesting" that she not receive tenure. (Dkt. No. 24-9, at 19–20). Daly explained that "[g]enerally [the Board] act[s] on the recommendation of the superintendent, not vice versa." (*Id*. at 20).

preparing an application and "write a recommendation" for her. (*Id*.; Dkt. No. 23-13, at 73).

Plaintiff responded that "there was more work for [her] to do at Cairo-Durham." (Dkt. No. 24,

¶ 19).

In January 2015, Plaintiff received a "counseling memorandum" from Taibi. (Dkt. No.

24, ¶ 21). In it, Taibi indicated that he had "concerns" regarding Plaintiff's handling of the grant

applications for the 2014–2015 school year and that he expected that "in the future" she would

"submit this information in a timely manner" and "ensure adequate monitoring of expenditures

throughout the year." (Dkt. No. 23-4, at 14). Taibi wrote that as of December 30, 2014, the

District had not received its "Title I and Title IIA allocations" and the "Title VI" had "not yet

been submitted, which places undue financial pressure on the district." (*Id*.). Taibi wrote that

although "the approval is the decision of the state," Plaintiff's "failure to submit these documents

in a timely manner . . . has resulted in these funding gaps." (*Id*.). Taibi wrote that the District's

"remaining unspent grant balance for the 13-14 school year far exceeded the allowable carryover

limits, forcing last minute expenditures and in some cases the loss of funds for grants that were

not able to be expended." (*Id*.).

Taibi wrote that when the grant application was "turned in via email on September 1st,

without supervisor signature (later signed on 9/18/14 when hard copies were subsequently

mailed), they were incomplete and required significant revisions before they could be approved."

(Dkt. No. 23-4, at 14). "On November 14th the Grants Office denied our application and returned

it with required revisions with a resubmission date no later than November 21st. These revisions

were not submitted until December 12th. To date our allocations are still pending." (*Id*.).

Taibi stated that in the future, he expected that Plaintiff would: "complete submission of

consolidated application by state specified application deadline"; "[m]eet with [b]usiness [o]ffice

[o]fficials to ensure accurate accounting of [g]rant [e]xpenditures to ensure" the grant money is "completely spent down prior to the end of the grant period"; and "[m]onitor expenditures periodically to ensure funds are being used for allowable purposes." (Dkt. No. 23-4, at 14). Taibi advised Plaintiff that she had the right to submit a written response and that he was forwarding the memo to the superintendent for inclusion in Plaintiff's personnel file and "possible additional discipline." (*Id.*). Taibi did not mention the special education computer issue. (*Id.*).

Plaintiff met with Taibi concerning the counseling memorandum, and was accompanied by her union representative, Tom Baumgartner, the Durham Elementary School Principal. (Dkt. No. 33, ¶ 13). Baumgartner suggested, as was "normal procedure with any employee being given a counseling memorandum," that a plan for improvement be developed for Plaintiff, (Dkt. No. 24-7, at 50), and that following "periodic overview and improvements, the memorandum be expunged from [Plaintiff's] record," (Dkt. No. 24, ¶ 21). Taibi "was not interested" in these suggestions and "repeated" that the Board would not give Plaintiff tenure. (*Id.* ¶¶ 22–23). Taibi testified that he "wouldn't have had a written plan,"[10] but that he assisted Plaintiff in developing "spreadsheets to help monitor grant allowances and expenditures." (Dkt. No. 23-13, at 84).

Plaintiff states that she "followed up that meeting with a written response to the counseling memorandum," placing "Taibi's criticisms in context," and submitting her "own plan for meeting his goals going forward." (Dkt. No. 24, ¶ 23). Plaintiff asserts that after she responded to the memorandum, "[w]ork was piled on, and [she] was given little assistance or cooperation from the staff and other administrators." (Dkt. No. 24, ¶ 24).

---

[10] Taibi acknowledged, however, that the District could do "principal improvement plans" (similar to a performance improvement plan) for any employee. (Dkt. No. 23-13, at 84–85).

### 4. Second Special Education Issue

In February or March 2015, a complaint arose concerning the timeliness of the District's procurement of a hearing device for a student with a Section 504 Plan that required a hearing device. (Dkt. No. 23-12, at 51). Plaintiff avers that Farrell made an issue out of this incident "by sending degrading and abusive emails to [her] demanding immediate fulfillment of this technology requirement," which she "diligently accomplished . . . in a matter of weeks." (Dkt. No. 24, ¶ 44). *See* Dkt. No. 23-4, at 63. Plaintiff explained that she first had to obtain approval from the business office, that she had "tried to buy the device from the student's former district," and when the district refused to sell it, she "moved on to investigating the purchase of a new device, which "was no longer sold brand new." (*Id.*). Additionally, "[p]urchasing a new device required medical documentation and approval." (*Id.*). Plaintiff testified that she obtained the device within a month. (Dkt. No. 23-12, at 53).

### 5. Formal Evaluation

In April 2015, when Plaintiff applied for a position in another school district, Taibi "offered to be one of [her] references" and "wrote a glowing letter of recommendation." (Dkt. No. 24, ¶ 25). In June 2015, after Taibi learned Plaintiff did not get the position, he scheduled a meeting with Plaintiff "for an evaluation." (*Id.* ¶ 25). Plaintiff avers that although the "administrators' contract" required the superintendent "to formally evaluate non-tenured employees two times a year," until then, she "had not received a formal evaluation."[11] (*Id.* ¶ 26). When they met on June 15, 2015, Taibi asked Plaintiff if she had a copy of the "Marshall's

---

[11] Plaintiff states that although Taibi prepared an evaluation in July 2014, he never shared it with her. (Dkt. No. 24, ¶ 26; Dkt. No. 24, at 35–42).

rubric," which is used to evaluate a "building principal's duties and responsibilities."[12] (Dkt. No. 23-12, at 62–63). Plaintiff responded that said she did not and that she did not "know what the Marshall's rubric" was. (Dkt. No. 23-12, at 63). Plaintiff states that Taibi told her that "the rubric was used in administrative evaluations." (Dkt. No. 24, ¶ 27). Plaintiff testified that she "then told him that [she] had not been evaluated," and that Taibi responded, "Oh yes, that is a problem."[13] (*Id*. ¶ 27). They discussed the performance categories contained in the evaluation rubric, and Plaintiff "pointed out that many of the categories did not apply to [her] as a director, that they were designed for the building principals. (*Id*. ¶ 27). Plaintiff testified that Taibi agreed and suggested that they each take a copy of the rubric and "go through it and come back and meet." (Dkt. No. 23-12, at 63–64). Taibi again "reminded" Plaintiff that the Board would not grant her tenure. (Dkt. No. 24, ¶ 27). There is no evidence that they met again to discuss the rubric.[14]

### 6. Request for Resignation and "Younger" or "Newer" Administrators

On June 18, 2015, Taibi emailed Plaintiff "instructing [her] to meet with him that day" and advising her to bring her union representative. (Dkt. No. 24, ¶ 28). At the meeting, Taibi advised Plaintiff that the Board would not approve her tenure (even though her tenure recommendation was not due until spring 2016) and "that it was in [her] best interest to resign." (*Id*.). Taibi suggested that Plaintiff "submit a letter of resignation for 'personal reasons,'" and

---

[12] Taibi testified that he "directed all administrators to come to the [evaluation] meeting with the performance evaluation and evidence that they would use to support their own self-evaluation regarding the marshall rubric." (Dkt. No. 23-13, at 86).

[13] Taibi testified that he prepared a similar evaluation of Plaintiff in the summer of 2014, shortly after he became interim superintendent, and that he gave it to Plaintiff. (Dkt. No. 23-13, at 15). Plaintiff states Taibi "never shared with me the evaluation he wrote immediately upon becoming acting superintendent." (Dkt. No. 24, ¶ 26).

[14] On July 1, 2015, Taibi sent the following email to Plaintiff:

> Please set-up a meeting . . . to reschedule your evaluation meeting. We were unable to complete your evaluation at our meeting on June 15th because you were unable to complete your self-evaluation. As with all administrators, I asked that you complete a self-evaluation using the attached rubric prior to our meeting. Unfortunately you were unable to do so, which forced us to reschedule. So that we can proceed, please bring your completed rubric to our meeting.

(Dkt. No. 23-6, at 93). There is no evidence that the evaluation meeting was rescheduled.

stated that "in exchange," he would write her a letter of recommendation.[15] (*Id.*). Taibi told

Plaintiff that "the resignation would look better than being dismissed from a probationary

appointment" and gave her one week to submit the letter. (*Id.*). Plaintiff states that when she

asked Taibi for the reason for her termination, he responded, "[W]e really don't have to have a

reason." (Dkt. No. 23-12, at 72). When she pressed him further, he cited her "lack of ability to

run [her] department," her "lack in completing grants and managing those funds and completing

the requirements," and her failure to perform teacher observations, which Plaintiff told him she

was "in the process of completing." (*Id.*).

Plaintiff testified that after learning that "they [were] looking to terminate" her, "there

was an e-mail that [she] was part of" that indicated that Farrell, who "was head of the

administrators' bargaining unit," "had met with the board of education regarding . . . contract

negotiations" and commented "that the board is interested in retaining younger administrators."[16]

(Dkt. No. 23-12, at 85–86; Dkt. No. 24-7, at 43). Plaintiff states that she believed the Board was

"interested in retaining the younger administrators" and would "eliminate [her] salary and . . .

replace [her] with people that may not be at the same salary rate." (Dkt. No. 23-12, at 86).

---

[15] Plaintiff states that "a few days" after her meeting with Taibi, he called her and read the letter of recommendation to her over the phone. (Dkt. No. 23-12, at 74). In it, Taibi referenced the work Plaintiff had done "developing plans, the action items" that were completed, her work with a professional development plan, her ability "as a director of pupil services," and her leadership skills. (*Id.*). The letter does not appear to be in the record. Taibi testified that in the letter he wrote that Plaintiff's "experience and expertise" had "support and assistance in the development of our District Comprehensive Improvement Plan (DCIP) over the last two years has helped to prioritize specific areas of focus as we work toward continuous improvement." (Dkt. No. 23-13, at 4–5). He further wrote that Plaintiff's "collaboration with both the elementary and middle school administration in implementing iReady, as well as prioritizing response to intervention . . . and establishing consistency kindergarten through eighth grade has helped our students demonstrate growth and improvement." (Dkt. No. 23-13, at 6). "In addition, [Plaintiff's] efforts over the last year to help establish in-district programming for our special education students has enabled us to return several students from out of district placements to in-district programming so that their educational program is in their home district with their peers." (*Id.* at 9–10).

[16] The parties have not provided a date for this email, but assuming it was in the spring or summer 2015, the District then employed ten administrators, including Plaintiff, whose ages were 32, 33, 33, 38, 45, 45, 46, 51, 58 (Plaintiff), and 60. (Dkt. No. 23-6, at 3–4). Three, including Plaintiff, were women. (*Id.* (Linda Wistar, age 60, and Marie Culihan, age 33)).

Taibi recalled Farrell's report differently, and testified that he had been told that Farrell used the term "newer" in reference to administrators at an administrative negotiation update meeting. (Dkt. No. 23-13, at 96). Taibi stated that "newer was not necessarily younger. It was meant to retain the recently hired administrators to make sure that we didn't have continued turnovers." (Dkt. No. 23-13, at 97).[17]

On June 22, 2015, Plaintiff received a letter from Taibi notifying her that he intended to recommend to the Board at the July 23, 2015 meeting that her "services as a probationary administrator be discontinued" and that if the Board accepted the recommendation, Plaintiff's "last day as an administrator . . . will be August 31st, 2015." (Dkt. No. 24, ¶ 29; Dkt. No. 23-4, at 8).

### 7. Special Education Teacher Evaluations and Second Counseling Memorandum

In addition to her other duties, during the 2014–2015 school year, Plaintiff had been assigned the task of evaluating special education teachers. (Dkt. No. 23-12, at 67–68). This required "walk-throughs and evaluations, meeting with the teachers prior to the evaluation, [and] observation of the special ed teachers." (Dkt. No. 23-12, at 68). On June 22, 2015, Taibi sent an email to the building principals and Plaintiff, requesting "all completed observations" and reminding that "all teachers" must "have their '60 Point' scores by the June 30th deadline." (Dkt. No. 23-4, at 38). Taibi sent a second email to Plaintiff requesting "the observation summary report" for several special education teachers, which he needed to complete the teachers' "year

---

[17] Baumgartner testified that Farrell reported "that the board seemed willing or eager . . . to work with the newer administrators." (Dkt. No. 24-7, at 43). "At that time we had three, four . . . administrators that were brought in that were newer and younger, less experienced administrators." (*Id.*). Baumgartner explained that the reason Farrell's report "really stuck out was because it appeared like it was almost intentional like the way he said it, because he knew I wasn't one of the newer ones and [Plaintiff] wasn't one of the newer ones, and it just seemed like it was being kind of in the way to get to you. . . . [I]t felt like my higher-ups weren't as eager to work with me as they were with these new, lesser experienced people that were coming in." (*Id.* at 43–44).

end evaluation 60 point component." (Dkt. No. 23-4, at 38–39). Plaintiff testified that, at this point, there were three evaluations that she needed to complete but that because she had "used a Word document," she "was having trouble with those getting into the system on those [three] teachers." (Dkt. No. 23-12, at 71).

On July 13, 2015, Plaintiff received a second counseling memorandum from Taibi along with a performance evaluation. (Dkt. No. 31, ¶ 13; Dkt. No. 33, ¶ 13; Dkt. No. 24, ¶ 30; Dkt. No. 23-4, at 16). In the counseling memorandum, Taibi wrote that Plaintiff, as the "administrator in charge of special education," was responsible for "complet[ing] all necessary observations and other related obligations for special education teachers to insure such evaluations are timely and accurately completed." (*Id*.). According to Taibi, "by contract and APPR agreement," "these evaluations are due to teachers no later than July 1"; as of July 13, 2015, they had not received their evaluations, and "by submitting them late, we run the risk of having the results invalidated because contractual obligations have not been met." (*Id*.). Plaintiff avers that her "peers, the other principals, were not sanctioned for late submission of teacher evaluations." (Dkt. No. 24, ¶ 40).

Attached to the counseling memorandum was Taibi's evaluation of Plaintiff for the 2014–2015 school year. (Dkt. No. 23-4, at 19–26). Taibi gave Plaintiff an "overall rating" of "improvement necessary," and commented that Plaintiff failed to complete the "[o]bservation and evaluation of instructional personnel" in "a timely manner resulting in not meeting contractual and APPR timelines" and needed to prioritize the drafting of the Cairo-Durham Special Education plan for services. (*Id*.).

### 8.     Termination of Employment

In a letter to Plaintiff dated July 20, 2015, Taibi provided "the reasons" he intended to recommend that the Board "discontinu[e] . . . [her] probationary appointment." (Dkt. No. 23-4, at

17). In the letter, Taibi cited: (1) Plaintiff's failure to complete the special education teachers' "evaluation ratings"; (2) Plaintiff's handling of the 2014–2015 grant applications, including her failure to "meet established and known deadlines" and submission of "inaccurate materials"; and (3) situations that occurred during the 2014–2015 school year that "reflect[ed] poorly on [Plaintiff's] leadership of the Special Education Department," including "the untimeliness of students receiving appropriate services or devices." (Dkt. No. 23-4, at 17–18). Taibi also noted Plaintiff's failure to "bring a completed self-evaluation using the agreed upon rubric (as was expected of each administrator)," "[d]espite having been advised of the need" to do so. (Dkt. No. 23-4, at 18). Taibi wrote that "[t]his forced the meeting to be rescheduled again demonstrating a pattern of not being timely prepared on important matters." (*Id*.).

In a written response to Taibi's letter and the counseling memorandum, Plaintiff wrote that because she "never received an evaluation from the district during [her] probationary term and a decision was made to deny . . . tenure," "[t]here was no basis to adjust any real or perceived performance issues." (Dkt. No. 23-4, at 97). Regarding the special education teacher evaluations, Plaintiff stated that she had been "making every effort to complete" them when she learned she was facing termination and that since then, she has "had tremendous difficulty in finishing the observation/written reports" "[d]ue to hostile working conditions in the district." (*Id*.). Plaintiff wrote that, in addition, "the practitioners that became [her] responsibilities were not all shared with [her] correctly" and, as a result, she was "still unable to score some of the portfolios." (*Id*.). Plaintiff added that "this was the first year using the evaluation system online" and that it was "cumbersome and time-consuming, and with no training [she] was on [her] own." (*Id*.).

Concerning "grant management," Plaintiff wrote that grant writing "is a team function" and that if the grants were not "completed in a timely manner it reflects on the whole district not just the grant writer." (*Id*. at 100). Plaintiff further wrote that though she has shared expenditure tracking with the building principals, there was "a lack of communication on the part of the principals in regards to the allocation of these resources." (*Id*.).

Plaintiff also took issue with Taibi's assertion that her provision of services or devices to special education students was untimely, explaining that, with respect to the hearing device, she had not received adequate information from the student's previous district and had to conduct research before she could finalize the purchase. (*Id*.). Plaintiff wrote that Farrell had used this situation to "harass" her. (*Id*.).

Plaintiff noted that "Farrell was always confrontational and made [her] work environment very uncomfortable and difficult," that she "had spoken to [Taibi] many times about his attitude," but that Farrell's behavior "still continued." (Dkt. No. 23-4, at 98). Plaintiff asserted that despite her "expressed concern" about the "boys club" in the District, Taibi "did not make any effort to address this." (*Id*.). Plaintiff raised Farrell's comment that the Board was "open to negotiating with newer administrators, because they are eager to retain them"—a comment Plaintiff found "troubling and yet consistent with the environment with which [she had] been made to work in." (*Id*.). Plaintiff recounted her achievements in creating special education programs, providing a "continuum of services," and assisting the special education staff on how to write appropriate IEPs. (*Id*. at 99). Plaintiff questioned why Taibi encouraged her to apply for superintendent jobs in other districts "based on the merits of [her] work," when she "was no longer welcome to continue as a PPS Director," and asserted that "[t]his has more to do with age . . . and sex discrimination than . . . performance." (*Id*.).

On July 23, 2015, the Board voted to terminate Plaintiff's employment. (Dkt. No. 24, ¶ 31). Board President David Infantino testified that from July 2014 to July 2015, the only information he recalled Taibi providing concerning Plaintiff's performance was that the District "missed a submission date for something to New York State Ed.," and that "he had counseling sessions and that he was going to propose . . . a probationary termination." (Dkt. No. 24-11, at 37–38). Infantino stated that the Board relied on Taibi's recommendation to dismiss Plaintiff and that he did not "review any reasons" for her dismissal. (*Id*. at 38).

Plaintiff states that during her employment, working with teams from the different schools in the District as well as building principals and outside consultants, she helped the District achieve Title I compliance, and test scores and graduation rates of special education students improved, "which was significant because low special education scores and graduation rates were an important cause of the Focus designation." (Dkt. No. 24, ¶ 11). Plaintiff developed "in-district special education programming" that saved the District money. (*Id*.). The middle school was taken off the list of schools in need of improvement. (*Id*.). Under the improvement plans Plaintiff developed and supervised, students' scores in "Math, English, Language, and Arts improved." (*Id*.).

### 9.     Plaintiff's Replacements

The District hired Linda Wistar, who was approximately one year older (age 60) than Plaintiff, "per diem" to take over Plaintiff's special education responsibilities. (Dkt. No. 23-13, at 100; Dkt. No. 23-6, at 4). Wistar was working with Doug Morrissey (age 45), "who was being considered for that role." (Dkt. No. 23-13, at 100; Dkt. No. 23-6, at 4). Plaintiff asserts that the District hired Wistar solely for the purpose of training Morrissey, who was "considerably younger than Plaintiff," and who the District eventually named Director of Special Education; "the position was never posted." (Dkt. No. 33, ¶¶ 19, 18, Dkt. No. 23-6, at 4).

Initially, the District placed Baumgartner (age 46) on "special assignment" in the Director of Curriculum and Instruction position. (Dkt. No. 23-13, at 104; Dkt. No. 23-6, at 3). In July 2016, the District placed AnneMarie Powers Algozzine (age 54) in the position; she "left within a year" and was replaced by Farrell, who was in his thirties. (Dkt. No. 33, ¶ 19; Dkt. No. 23-6, at 3–4). Plaintiff asserts that the "District currently has no female administrators." (Dkt. No. 24, ¶ 33).

Plaintiff filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC") and, on June 7, 2016, the EEOC issued a dismissal and notice of right to sue. (Dkt. No. 23-4, at 7).

## III.     STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to

return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

IV.    **DISCUSSION**

   A.    **Title VII Discrimination Claim**

Discrimination claims under Title VII are generally evaluated under the *McDonnell Douglas*[18] burden-shifting analysis. *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 92 (2d Cir. 2013); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. *Hicks*,

---

[18] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

509 U.S. at 506. "The requirements to establish a prima facie case are 'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (citation omitted) (first quoting *Hicks*, 509 U.S. at 506; then quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. *Hicks*, 509 U.S. at 506. The burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 507. If the defendant carries that burden, the presumption of discrimination "drops from the picture," and the burden shifts back to the plaintiff, who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013). "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock*, 224 F.3d at 42 (alterations in original) (internal quotation marks omitted).

### 1.     Prima Face Case

To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 497 (E.D.N.Y. 2012) (citing *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 491–92 (2d Cir. 2009)). The fourth factor of this test may be satisfied either by "(1) direct evidence of discriminatory intent, or (2) a showing by the Plaintiff that '[she] was subjected to disparate

treatment . . . [compared to persons] similarly situated in all material respects to . . . [herself].'"

*Bennett*, 842 F. Supp. 2d at 497 (second alteration in original) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). There is no dispute, for purposes of this motion, that Plaintiff satisfies the first, second, and third factors. (Dkt. No. 23-14, at 8–9). Defendants contend, however, that "there is simply no evidence that plaintiff can establish the fourth factor." (*Id*. at 8).

Defendants assert that after Plaintiff's employment was "discontinued," the District placed Linda Wistar, a female, in her position and in 2016 placed AnneMarie Powers Algozzine, also a female, in the "Director of Curriculum and Instruction portion of the position." (Dkt. No. 23-14, at 9). Plaintiff, however, has presented evidence that the District brought in Wistar "solely to train" Doug Morrissey, "a man[,] to be Director of Special Education." (Dkt. No. 24-12, at 15). Taibi acknowledged that Wistar was "working with Mr. Morrissey," "who was being considered" for special education director, and that he was eventually appointed to the position. (Dkt. No. 23-13, at 101–02). Plaintiff further argues that the District initially placed a male (Baumgartner) in the Director of Curriculum and Instruction position, and that although the District later hired a female (Powers Algozzine) for the Director of Curriculum and Instruction position, she stayed only a year, and that a male (Farrell) presently occupies the position. (Dkt. No. 24-12, at 24). Viewing the evidence regarding the District's intent to place Morrissey and then Farrell, both male, in Plaintiff's position(s), in the light most favorable to Plaintiff, the Court concludes that she has satisfied her prima facie burden of showing discriminatory intent. *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis."); *Cook v.*

*Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1239 (2d Cir. 1995) (finding prima facie case of gender discrimination where there was "ample evidence that [the plaintiff] performed her work in an exemplary fashion, was fired, and was replaced by a male"); *Giannone v. Deutsche Bank Sec., Inc.*, 392 F. Supp. 2d 576, 587 (S.D.N.Y. 2005) (concluding that "the fact that Estes initially tried to replace Giannone with a man reflects a preference for a person outside Plaintiff's protect[ed] class and suffices to support an inference of discrimination" at the prima facie stage).

### 2.        Legitimate, Nondiscriminatory Reasons

As Plaintiff has established a prima facie case of discrimination with respect to her termination, a presumption of discrimination arises, and the burden shifts to Defendants to demonstrate some legitimate, nondiscriminatory reason for the adverse action. *McDonnell Douglas Corp.*, 411 U.S. at 802; *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011). Defendants have satisfied that burden here. Defendants have submitted evidence that the decision not to renew was based on legitimate, nondiscriminatory reasons, including: (1) Plaintiff's late, and incomplete, submission of the 2014–2015 grant application; (2) "poor leadership" in the special education department and "the untimeliness of students receiving appropriate . . . devices"; and (3) Plaintiff's failure to complete special education teacher evaluations in a timely manner. (Dkt. No. 23-4, at 17–18). Therefore, the burden shifts back to Plaintiff to establish that these reasons were a pretext for discrimination. *Weinstock*, 224 F.3d at 42.

### 2.        Pretext

A plaintiff's burden at the third stage of the *McDonnell Douglas* burden-shifting analysis is to produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock*, 224 F.3d at 42

(alterations in original) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)). In other words, the Court must "now ask whether, without the aid of the presumption" of discrimination raised by the prima face case, the plaintiff "has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire [her] was based, at least in part, on [her gender]." *Holcomb v. Iona College*, 521 F.3d 130, 141 (2d Cir. 2008). "[A] plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). Pretext may be shown, inter alia, "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" nondiscriminatory reasons for its action. *Id*. at 846. Further, "[w]hile departures from regular procedures 'can raise a question as to the good faith of the process where the departure may reasonably affect the decision,' summary judgment is appropriate where 'whatever irregularities existed' were either unrelated to discrimination or 'did not affect the final [adverse] decision.'" *Hiramoto v. Goddard Coll. Corp.*, 684 F. App'x 48, 50 (2d Cir. 2017) (quoting *Weinstock*, 224 F.3d at 41, 45).

Plaintiff asserts that the timing and sequence of Taibi's actions, along with procedural irregularities show pretext.[19] Taibi voiced his concerns to Plaintiff over the lateness of the grant application and handling of the grant monies in August and September 2014. However, when

---

[19] Plaintiff argues that the record shows that because of her efforts, the District achieved Title I compliance,"[opening quotation mark missing] the middle school was removed from the list of schools in need of improvement, test scores and graduation rates of special education students "improved dramatically," and students' scores in math and English improved. (Dkt. No. 24, ¶ 11). Plaintiff also asserts that any issues with the grant application, grant monies, and any delay in the procurement of devices for special education students were "caused by actions taken that were not in [her] control." (Dkt. No. 24, ¶¶ 38, 45). But an employee's disagreement with an employer's evaluation "does not prove pretext." *Shabat v. Billotti*, No. 96-7638, 1997 WL 138836, at *2, 1997 U.S. App. LEXIS 5133, at *5 (2d Cir. Mar. 18, 1997) (quoting *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991)); *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) (stating that "plaintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim"), *aff'd*, 205 F.3d 1327 (2d Cir. 2000).

Taibi first told Plaintiff in October 2014 that the Board would "never give" her tenure, and suggested that she look for another position, he did not refer to any issues with the grant; he said only that he "did not know" the reasons for this decision. (Dkt. No. 24, ¶ 19). Further, although the January 2015 counseling memorandum concerning the grant issues cited additional deficiencies that had occurred between September and December 2014, it principally concerned the grant issues that arose in August and September 2014. Thus, while there may be a view of the evidence that would support the timing of the issuance of the counseling memorandum, drawing all inferences in Plaintiff's favor, a reasonable factfinder could conclude that Taibi issued this counseling memorandum in an effort to provide support for his previously expressed (but unexplained) statement that Plaintiff would not receive tenure and that she should look for another position. *Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 663 (2d Cir. 2009) ("Inconsistent or even post-hoc explanations for a termination decision may suggest discriminatory motive." (citing *Carlton v. Mystic Transp. Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) and *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994))).

Plaintiff has also adduced evidence that it was "normal procedure" to develop a plan for improvement for "any employee being given a counseling memorandum," and that, although her union representative requested one on her behalf, she did not receive one. (Dkt. No. 24-7, at 50; *see* Dkt. No. 23-13, at 84 (Taibi acknowledged that there was no written improvement plan)). Thus, Plaintiff has raised a material issue of fact as to whether the District deviated from normal procedure by not providing Plaintiff with a plan for improvement following the first counseling memorandum. *See Villar v. City of New York*, 135 F. Supp. 3d 105, 125 (S.D.N.Y. 2015) ("Departures from procedural regularity can be evidence of pretext.").

When Taibi informed Plaintiff on June 18, 2015, that the Board would not approve her tenure and advised her that if she did not resign, her employment would be terminated at the July Board meeting, (Dkt. No. 23-12, at 72–73), he again cited the grant application and management of grant monies as a reason for her termination but added that the decision was also based on Plaintiff's "lack of ability to run [her] department" and failure to complete "teacher observations." (Dkt. No. 23-12, at 72). While Taibi may have been genuinely concerned about Plaintiff's ability to comply with the June 30, 2015 deadline for completing teacher observations—indeed, she ultimately did not complete them—Plaintiff's teacher observations were not yet late at the time Taibi made that comment, suggesting that his reasons for terminating Plaintiff were pretextual. *Schmitz v. St. Regis Paper Co.*, 811 F.2d 131, 132–33 (2d Cir. 1987) (employer shifting explanations provides evidence of pretext).

Finally, there is the evidence of Taibi's post-termination issuance of a second counseling memorandum. On July 13, 2015, despite having already advised Plaintiff that he intended to recommend her termination to the Board, Taibi issued a second counseling memorandum concerning Plaintiff's "handling of observations and evaluations for the 2014-2015 school year" and indicating that the memorandum would be placed in her personnel file. (Dkt. No. 23-4, at 16). To the memorandum, Taibi attached Plaintiff's 2014–2015 performance evaluation in which he gave her an "overall rating" of "improvement necessary." (Dkt. No. 23-4, at 19–26). A reasonable factfinder could conclude that the counseling memorandum and attached performance reviews were post-hoc attempts to justify termination and, as such, evidence of pretext. *See Kourofsky*, 459 F.Supp.2d at 212 (finding that the fact that both plaintiffs received negative performance reviews a day after they were told of their termination is evidence of pretext); *Sklaver v. Casso-Solar Corp.*, No. 02-cv-9928, 2004 WL 1381264, at *8, 2004 U.S. Dist. LEXIS

24934, at *26 (S.D.N.Y. May 15, 2004) ("[W]hen the employee only learns of [a] negative performance review after his termination . . . 'a reasonable jury could conclude [that this] constitute[s] a post-hoc attempt to justify the . . . decision.'" (quoting *Aufdencamp v. Irene Stacy Cmty. Mental Health Ctr.*, 234 F. Supp. 2d 515, 518 (W.D. Pa. 2002))).

In addition to presenting evidence of pretext, and in support of her burden of showing that discrimination was the real reason for her termination, *see Weinstock*, 224 F.3d at 42, Plaintiff relies, inter alia, on evidence that she was replaced by Morrissey, a male, and on Taibi's complaint to then-superintendent Fassett, that "the administrators," all of whom were male, "were feeling that [Plaintiff] was too bossy." (Dkt. No. 23-12, at 95). Construed in the light most favorable to Plaintiff, and in light of all of the circumstances of this case, a jury could infer that Taibi, who, if Plaintiff's version of the events are credited, was the sole decision-maker, was motivated by negative assumptions about how women in positions of authority should behave. *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 116 (2d Cir. 2007) ("The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class."), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see also Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 310 (S.D.N.Y. 2016) ("Martinez's references to Johnson's being 'bossy' can be understood not as a sex-neutral insult but rather as invoking a double standard for men's and women's leadership in the workplace."). Thus, the Court concludes that Plaintiff has raised material issues of fact as to whether she was terminated based on gender. Accordingly, Defendants' motion for summary judgment on Plaintiff's Title VII gender discrimination claim is denied.

### B.      Retaliation

#### 1.      Prima Facie Case

Plaintiff's claims that she was terminated in retaliation for her October 2014 discussion with Taibi about the "boys' club" among administrators and the Board, and complaint that she had been excluded from certain meetings and dinners with male administrators. Retaliation claims under Title VII must be analyzed under the *McDonnell Douglas* burden-shifting framework. *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 74 (2d Cir. 2015); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 681 (S.D.N.Y. 2012). Plaintiff must first establish a prima facie case of retaliation. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). If Plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, nonretaliatory reason existed for its action. *Id*. at 129. If the employer demonstrates a legitimate, nonretaliatory reason for the adverse employment action, the burden shifts back to the employee to establish that the employer's action was caused by a retaliatory motive. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). The four prongs of a prima facie case of retaliation are that: (1) the plaintiff engaged in protected activity; (2) the defendant was aware of the activity; (3) the defendant took adverse employment action against the plaintiff; and (4) there is a causal connection between the protected activity and the adverse employment action. *Summa*, 708 F.3d at 125. The first and fourth prongs are at issue in this case.

#### 2.      Protected Activity

Defendants argue that Plaintiff has failed to show she engaged in a protected activity because she did not have a "good faith basis to believe that the issues she complained of to Mr. Taibi were unlawful under Title VII." (Dkt. No. 23-14, at 14). "An employee's complaint may qualify as protected activity, satisfying the first element of this test, 'so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated

the law.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001)). "And not just any law—the plaintiff is 'required to have had a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII.'" *Id.* (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001)). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Id.* at 14–15 (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

Here, Plaintiff has presented evidence that in September 2014, she told Taibi that she believed that the District was a boys' club, that she was the only female administrator and that she felt that the male administrators "were part of a group that [she] wasn't part of." (Dkt. No. 23-13, at 32). She complained that she had been excluded from "pre-meeting get-togethers" and not "informed of meeting topics that others seemed to have already discussed;" she also mentioned the "generally disrespectful and dismissive ways the male administrators in the district treated the women they worked with, including" her. (Dkt. No. 24, ¶ 18). Plaintiff also told Taibi that "it sure seemed that men were given preferential treatment compared to women." (*Id.*).

Viewing this evidence in the light most favorable to Plaintiff, the Court concludes that she has adduced sufficient evidence to show that she had a good faith, reasonable belief she was complaining of unlawful gender discrimination—by complaining to Taibi that there appeared to be a "boys' club" among the administrators, from which she was excluded as a female, that the male administrators had been dismissive of her because she was a female, and that the District gave preferential treatment to men "compared to women," (Dkt. No. 24, ¶ 18), a reasonable jury could conclude that Plaintiff had a good faith belief that she was complaining of gender

discrimination. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ("[T]he law is

clear that opposition to a Title VII violation need not rise to the level of a formal complaint in

order to receive statutory protection, this notion of 'opposition' includes activities such as

'making complaints to management, writing critical letters to customers, protesting against

discrimination by industry or by society in general, and expressing support of co-workers who

have filed formal charges.'" (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.

1990))).

### 3. Causal Connection

"[P]roof of causation can be shown either: (1) indirectly, by showing that the protected

activity was followed closely by discriminatory treatment, or through other circumstantial

evidence such as disparate treatment of fellow employees who engaged in similar conduct; or

(2) directly, through evidence of retaliatory animus directed against the plaintiff by the

defendant." *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (quoting *Gordon v. N.Y.C Bd. of

Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

The temporal proximity between the alleged protected activity, on the one hand, and

Taibi's notice to Plaintiff that the Board would not give her tenure and that she should look for

another position, on the other hand, was approximately one month. *See White v. Dep't of Corr.*

*Servs.*, 814 F. Supp. 2d 374, 390 (S.D.N.Y. 2011) ("[T]he passage of approximately one month

between the protected activity and the retaliation is a sufficiently short period of time for a

reasonable jury to determine that the two events were causally connected."); *Scheiner v. N.Y.C.*

*Health & Hosps.*, 152 F.Supp.2d 487, 497 (S.D.N.Y. 2001) (temporal proximity of one month

between protected activity and adverse action supported allegation of causal connection

sufficient to survive summary judgment).

Defendants argue that Plaintiff cannot establish a causal connection based on temporal proximity because the "issues with plaintiff's job performance preceded her complaints" to Taibi. (Dkt. No. 23-14, at 15). Taibi, however, did not inform Plaintiff that her job was in jeopardy or issue a counseling memorandum regarding the grant until after her September 2014 complaint. Further, as Taibi's notice in October 2014 that the Board would not give Plaintiff tenure was the first in the sequence of actions Taibi took against her that culminated in his June 2015 notification that he was recommending dismissal to the Board, the Court concludes that Plaintiff has raised a material issue of fact concerning causation. *See White*, 814 F. Supp. 2d at 388–89 (finding material issue of fact as to causal connection based on temporal proximity where the plaintiff adduced evidence that she received a notice of discipline one month after protected activity, and that the notice of discipline was followed by formal counseling letters, a negative comment in her performance evaluation, and the denial of an internal position over the ensuing eight months).

Additionally, Plaintiff has presented evidence from which a reasonable factfinder could find retaliatory animus. Taibi testified during his deposition that he found Plaintiff's September 2014 "boys' club" reference offensive. (Dkt. No. 23-13, at 70). Drawing all inferences in Plaintiff's favor, a reasonable factfinder could find Taibi's reaction evidence of retaliatory animus. *See White*, 814 F. Supp. 2d at 390 (finding the plaintiff's allegation that the defendant "yelled at her and said he did not know what was wrong with her after he learned that she had filed a charge with the EEOC" to be "some evidence from which a reasonable jury could conclude that the defendants harbored retaliatory animus," explaining that "[n]egative reactions

by an employer to a plaintiff's complaints of discrimination have been deemed indicative of retaliatory animus" (citing *Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003))).[20]

### 4. Legitimate, Nonretaliatory Reasons

As stated above, Defendant has articulated legitimate, nondiscriminatory reasons for the decision to terminate Plaintiff's employment, which are also nonretaliatory in nature. *See supra* Section II.A.2.

### 5. Pretext

Under the *McDonnell Douglas* framework, if the defendant provides a non-retaliatory reason for the adverse action, that reason overcomes the presumption of retaliation created by the plaintiff's prima facie case. *Zann Kwan*, 737 F.3d at 845. The defendant is then entitled to summary judgment unless the plaintiff comes forward with evidence showing that the "non-retaliatory reason is a mere pretext for retaliation," *id.*, and that the plaintiff's "protected activity was a but-for cause of the alleged adverse action by the employer," *Nassar*, 570 U.S. at 362; *see also Sass v. MTA Bus Co.*, 6 F. Supp. 3d 238, 246–47 (E.D.N.Y. 2014) (applying but-for standard to the plaintiff's retaliation claim under Title VII). "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 845-46. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or

---

[20] Plaintiff argues that there is "direct evidence of retaliation," namely, Taibi's admission "that he was offended by the boys' club reference" revealed "his animus over a complaint of discrimination," and that the *McDonnell Douglas* burden shifting framework need not proceed further. (Dkt. No. 24-12, at 16–17 (citing *Hamza v. Saks Inc.*, 533 F. App'x 34, 35 (2d Cir. 2013) ("It is well established in this Circuit that where direct evidence of retaliatory motive is not available, the *McDonnell Douglas* burden shifting analysis applies to Title VII retaliation claims.")). Plaintiff has not cited case law that would support a conclusion that Taibi's offense at her referral to the District as a "boys' club," without more, is direct evidence of retaliatory intent. In any event, as discussed above, the evidence is sufficient to raise a material issue of fact on Plaintiff's retaliation claim under the burden shifting framework.

contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan*, 737 F.3d at 846. "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.*

Here, Plaintiff has come forward with evidence that: (i) Taibi found Plaintiff's reference to a "boys' club" in the District to be offensive; (ii) Taibi informed Plaintiff, in October 2014—one month after she complained about the "boys' club" and gender discrimination—not only that the Board would not give her tenure but that she should look for a position in another district; (iii) Taibi did not provide the reasons for this purported decision about her future at the District; (iv) as of October 2014, the Board had not discussed Plaintiff's tenure; (v) although the first counseling memorandum was based, in large part, on Plaintiff's failure in September 2014 to meet the grant application deadline and mismanagement of the previous school year's grant monies, Taibi did not issue it until January 2015—three months *after* Plaintiff complained of gender discrimination; (vi) Taibi informed Plaintiff again in January 2015 that the Board would not grant her tenure (though, again, there is no evidence that the Board discussed Plaintiff's tenure at this point); and (vii) on June 18, 2015, when Taibi informed Plaintiff that she would be dismissed, he at first responded that the District "did not need a reason" but then cited her handling of the grant application and mismanagement of grant funds, as well as her lack of leadership in the special education department, and her failure to complete teacher observations, which were not due until June 30, 2015.

Given Taibi's negative reaction to Plaintiff's complaint regarding a "boys' club" and gender discrimination, the temporal proximity between Plaintiff's protected activity and Taibi's initiation of the events that led to her dismissal, Taibi's issuance of a counseling memorandum for Plaintiff's late filing of the grant application and handling of the prior school year grant

monies after Plaintiff complained of gender discrimination, and Taibi's initial inability to provide a reason for denying tenure followed by the development of several reasons for denying tenure, the Court concludes that Plaintiff has raised a material issue of fact as to whether Taibi would have procured her dismissal from the District "but for" Plaintiff's complaint of gender discrimination. *See Zann Kwan*, 737 F.3d at 847 (holding that a discrepancy in punishment or explanation, "coupled with the temporal proximity between the complaint and the termination" supports a finding that a reasonable jury may find the complaint to be a but-for cause of the retaliatory conduct); *Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 540 (S.D.N.Y. 2017) (finding material issue of fact as to "but-for causation" based on a "discrepancy in punishment"—where there was evidence that the defendant had learned that the "Plaintiff had been discovered secretly recording a conversation . . . in April 2014" and did not discipline the plaintiff, but the defendant suspended the plaintiff several months later when "additional recordings came to light" after the plaintiff had filed a discrimination complaint,—explaining that the "discrepancy in punishment between the initial recording incident," for which the plaintiff was not punished, and "the subsequent 2015 incident, coupled with the temporal proximity between Plaintiff's suit and the suspension, is sufficient to thwart summary judgment"). While there is certainly a view of the facts that would support Defendants' version of events and that they had nonretaliatory reasons for terminating Plaintiff, given the material issues of fact, summary judgment is denied.

### C. Age Discrimination

The ADEA provides that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA protects "individuals who are at least 40 years of age." *Id.* § 631(a). The

*McDonnell Douglas* framework applies to claims of age discrimination under the ADEA. *See Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012). "Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (citing *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff succeeds, "the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for its action. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). "Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination." *Id.* This "requires proof that the plaintiff's age was a '*but-for cause of*,' and not merely one of the contributing motivations behind, the defendants' adverse employment decision, such that the decision 'would not have occurred without it.'" *Hall v. N. Bellmore Sch. Dist.*, 55 F. Supp. 3d 286, at 295–96 (E.D.N.Y. 2014) (quoting *Gross*, 557 U.S. at 177–78).

### 1. Prima Facie Case

"To establish a prima facie case, a plaintiff with an age discrimination claim must show '(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that the action occurred under circumstances giving rise to an inference of discrimination.'" *Bucalo*, 691 F.3d at 129 (quoting *Gorzynski*, 596 F.3d at 107).

Plaintiff was 58 at the time she was terminated, she was indisputably qualified for the position, and she was terminated. The parties dispute, however, whether Plaintiff can show her termination "occurred under circumstances giving rise to an inference of discrimination." Defendants offer evidence that Linda Wistar, who was 60, replaced her. Plaintiff disputes this

and has presented evidence that the District re-hired Wistar for the sole purpose of training

Morrissey, age 46, to take over the special education aspect of Plaintiff's position. *See Stratton v.*

*Dep't for the Aging*, 132 F.3d 869, 879–80 (2d Cir. 1997) (fact that plaintiff's duties were taken

over by individuals 13 and 26 years younger supports inference of discrimination); *Viola v.*

*Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716–17 (2d Cir. 1994) (sufficient inference of

discrimination for prima facie case where plaintiff's position filled by newly hired younger

employee within one year of his termination). Plaintiff has also presented evidence that the

Board was interested in working with "younger" administrators. This is sufficient to establish a

prima facie case of age discrimination.

### 2. Legitimate, Non-Discriminatory Reasons

As stated above, Defendants have articulated legitimate, non-discriminatory reasons for

the decision to terminate Plaintiff's employment. *See supra* Section II.A.2.

### 3. Pretext

For all the reasons previously stated, Plaintiff's evidence of pretext is sufficient and,

when combined with the evidence supporting her prima facie case, could permit a reasonable

factfinder to conclude that Plaintiff's age was a "but for" cause of the District's decision to

terminate her employment. *Gorzynski*, 596 F.3d at 107. When Taibi first informed Plaintiff in

October 2014 that the Board would not grant tenure and suggested that she look for another

position, he provided no reasons for the purported denial. Several months later, Taibi issued the

first counseling memorandum citing Plaintiff for, among other things, failing to submit the grant

application on time and mismanaging the grant money. *See Hall*, 55 F. Supp. 3d at 300 (finding

pretext where there was evidence that "after recommending Plaintiff's tenure denial and

termination for reasons unstated" the superintendent contacted principals "to solicit

'reasons/rationale' for the adverse employment decisions that 'would hold as evidence,'" explaining that "[t]his fact, though not direct evidence of [age] discrimination, strongly suggests that Defendants' nondiscriminatory reasons were not the real reasons for denying tenure to, and terminating, Plaintiff").

Considering, first, the evidence of the purported falsity of Defendants' explanations for recommending denial of tenure and terminating Plaintiff, second, Plaintiff's evidence that the Board indicated a preference for working with "younger" administrators near the time of her termination, and third, the fact that Morrissey, who the District trained and then hired for Plaintiff's position, was 12 years younger than Plaintiff, the Court concludes that Plaintiff has identified triable issues of fact as to whether her age was the "but-for cause of" her termination. *See Hall*, 55 F. Supp. 3d at 300–01 (finding pretext on summary judgment and concluding that age "discrimination may well be the most likely alternative explanation," when the "falsity of Defendants' decisions" for its denial of tenure and termination of the plaintiff's employment, was considered along with the "facts establishing Plaintiff's prima facie case, including that her replacement and the only probationary music teachers who ever made tenure were much younger"). Accordingly, summary judgment is denied.[21]

## V.   CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 23) is **DENIED**.

**IT IS SO ORDERED**.

Dated: September 4, 2018
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

[21] The Court therefore likewise denies Defendants' request for attorneys' fees. (Dkt. No. 23-14, at 18).